## O. Z. LaFarn v. State.

No. 26,783.   February 3, 1954.
Rehearing Denied March 17, 1954.
Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) March 31, 1954.

*Jno. M. Barron* and *William T. Moore,* by *Jno. M. Barron,* Bryan, for appellant.

*Wesley Dice,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

The offense is murder; the punishment assessed is confinement in the state penitentiary for a term of 20 years.

The appellant was charged with murder with malice in that he shot and killed Eugene Williams on July 18, 1952, at a dance hall called the Blue Moon in Brazos County.

It is shown that Eugene Williams was shot once with a small caliber pistol and died therefrom. It is further shown that appellant fled and was gone for about two weeks and eventually came back on his own initiative and surrendered to the authorities.

There is much confusion relative to the state of facts set forth herein. All the parties to the transaction are colored people. There are no bills of exception found in the record, the

appellant relying upon the testimony alone to show that he shot and killed the deceased in self-defense.

The testimony shows that appellant, a two-time convict prior to this time, was in a convertible automobile with two other men and five girls; that he had called the attention of some of the girls to the fact that he was armed and was the only man who had ever shot up the Blue Moon Cafe. While the parties were inside of the dance hall, appellant placed his arm around one of the girls that he had brought with him, and he and the deceased seemed to have had some argument relative thereto. According to some of the witnesses, the deceased possessed himself of a pistol and threw it at the appellant; that appellant followed as the deceased went out of the building and was going behind a car; that he started to shoot at the deceased and finally killed him. Some witnesses said that the deceased had a pistol in his hand at the time the appellant was shooting at him, while other witnesses said that the deceased had no pistol in his hand at the time he was shot and killed.

Appellant's own testimony relative to this matter is in part as follows:

"Q. Tell this jury what happened from the time the trouble between you all, right on down in your own words? A. When we went to Son Bell's Place, Blue Moon, we went to dance, and I paid the most of the way in to the dance, and in the dance we kinda decided that we would go to Hearne, where we could dance all night, and I went in and put my arm around Henry Johnson and Shirley. I believe it is her man, and we were standing there, by the two of them, and I told them, 'Let's go to Hearne,' and she said as soon as we dance one more we can go to Hearne, and he came out of the clear blue sky, I did not know where he come from. Eugene snatched me around, started to hit me with a pistol, I thought it was a pistol, and he told me, 'If you hurt me I will shoot you one half in two,' and then he said, 'You wait here until I come back.' He went out the door, and I went to see where he went to get his gun from his car, I walked to the door and seen him go to the car, and I had my car key with me, and it was parked out, and if I tried to get away, as the cars were parked parallel but were parked just enough to keep me from backing out, to keep me from getting away, I kept a watch and seen him go to a gray car, looked to be a Ford, and open the door and reach in and come back, that is when I opened my door, there was no fender on the convertible, that was my car, and he come around back of

the other row of cars, that is when I come through and hit me with the pistol, that is when I hit him.

"Q. Where did he hit you? A. Right there.

"Q. With the barrel of the pistol? A. As he threw the barrel of the pistol I shot him.

"Q. Was you going after him or he coming after you? A. I had a pistol and until I seen he coming around the back and I was facing to get in my car to get away."

\*   \*   \*

"Q. Did you know what he had in his hand or not? A. I did not.

"Q. Do you know whether he had a gun? A. I was looking for him to have a gun.

"Q. You did look for the pistol and when he faced you then you shot, is that when you shot him? A. It is when I faced him.

"Q. Where did you go? A. When I shot him I broke and run, I could not run, I had a broken leg, I hopped behind the place and Henry was calling me, and they picked him up and carried him away from there and Henry was calling me, and the other car, the car that carried *her* to the hospital was the car that was parked behind my car.

"Q. Were you trying to get away? A. Yes, I was trying to get away.

"Q. Were you afraid that the boy was going to hurt you? A. Yes, sir.

"Q. In fact he had told you? A. I was afraid he would hurt me, and I watched him when he went to his car and watched him until he come back and watched for his gun."

It seems that the witnesses gathered themselves upon each side of the controversy, the ones in appellant's favor testifying that the deceased threw his pistol at the appellant, and the ones in favor of the state testifying that the deceased had no pistol.

Appellant testified on cross-examination as follows:

\*   \*   \*   \*

"Q. Now, you say you pulled the pistol and when he saw the pistol he left out? A. Yes, sir.

"Q. You took in after him, didn't you? A. I seen him and I seen him when he drew the pistol, I pulled the pistol."

\*   \*   \*   \*

"Q. You said that he went outside and you thought he had already gone? A. I did not say he was already gone.

"Q. You said he left? A. When he ran out the door to the car and when I seen him, I pulled my gun out, he was going on the other side and I was going to get in my car and leave.

"Q. Where were you standing when you fired the first shot? A. On the porch.

"Q. Where was Eugene? A. Going between the cars.

"Q. Going down between the cars? A. Yes.

"Q. You wanted to be sure he was not going to get anything and hit you with it? A. Not exactly.

"Q. Why did you shoot? A. I did not shoot; I was not trying—

"Q. Just a fourth of July prank? Firing a pistol? A. No, sir, not exactly. I was trying to get him not to come back there and keep him from hurting me.

"Q. He was not as big as you? A. It does not take a large person, no, sir.

"Q. Did you ever see him with a knife? A. I did not.

"Q. All he had was a pistol? A. He had a pistol.

"Q. A pistol? A. Yes.

\* \* \* \*

"Q. How many times did you shoot at Eugene? A. I don't know sir, exactly, I shot twice, I know three times.

"Q. How many bullets will that hold? A. It would not hold but five."

It seems that there is conflict, not only the appellant's own testimony, but also in the testimony of the witnesses. Some of the witnesses testified that the deceased had a pistol in his hand and threw it at the appellant, while other witnesses testified that he had no pistol of any kind; that the deceased was trying to get away at the time he was shot at more than once and hit one time by a bullet from the appellant's pistol.

Under these circumstances, we think that the jury had a right to decide the conflict in the testimony in favor of the state and to find the appellant guilty as charged in the indictment of murder with malice.

Thus believing, the judgment is affirmed.

### ON MOTION FOR REHEARING.

MORRISON, Judge.

Appellant takes us to task for the statement in our opinion that some of the witnesses testified that the deceased had no

pistol. The witness Seyfus testified that he saw the deceased immediately before he was shot and saw no pistol. This we think supports the statement made originally. Irrespective of this, the facts clearly show a case of provoking the difficulty. This the appellant concedes. All the witnesses testified that the appellant fired the first shot from the porch while the deceased was going toward an automobile. This forfeited appellant's right of self defense, and it is of no moment as to whether the deceased was armed or not at the time he was finally killed by the appellant's third bullet.

Appellant's contention is that, since the trial court did not charge the jury on the law of provoking the difficulty, the jury were bound to find that the appellant acted in his own self defense because some of the state's witnesses testified that the deceased was armed. With this we cannot agree. This is not a case where the court erroneously instructed the jury as to the law of the case. The failure of the court to charge on this phase of the state's case could not render a conviction, otherwise supported by the evidence, invalid.

Remaining convinced that we properly disposed of this cause originally, appellant's motion for rehearing is overruled.